Filed 11/18/22  In re E.F. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re E.F. et al., Persons Coming Under the Juvenile Court Law. | D080342 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ15535A-D) |
| v. | |
| R.F. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Michael Imhoff, Commissioner.  Affirmed in part; reversed in part, with instructions.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant, R.F.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant, A.R.

Claudia Silva, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Dana Shoffner, Deputy County Counsel for Plaintiff and Respondent.

Defendants Ryleigh F. (Mother) and Anthony R. (Father) are the parents of daughters Ed. (born 2018) and Ek. (2019). Mother is also the parent of daughter Er. (2011), whose father is Dameon H.; and son Ez. (2012), whose father is Erin R.[1] The four children are the subject of a dependency action filed by respondent San Diego County Health and Human Services Agency (Agency) in 2019 under Welfare and Institutions Code section 300.[2]

Other than Ek.,[3] the petitions in support of dependency alleged Mother physically abused the children "on various occasions during 2019," exposing them to "serious physical harm" and "substantial risk," "as evidenced by the bruising on the child[ren]'s bod[ies,] which the child abuse expert has stated is concerning for abuse." The petitions further alleged Mother had been observed "hitting" her older children "with belts and extension cords," and had a recent history of "violent and assaultive behavior."

Mother and Father failed to reunify with daughters Ed. and Ek., and Mother also failed to reunify with daughter Er. and son Ez.[4] At the time of the contested section 366.26 hearing in April 2022, 10-year-old Er. had

---

[1]     Mother has another son, Es. This child resides with his father in another state. Neither Es. nor his father, nor Dameon nor Erin, are parties in this action.

[2]     All further statutory references are to the Welfare and Institutions Code.

[3]     The petition filed on behalf of Ek. alleged there was substantial risk she would be abused or neglected as a result of the physical abuse suffered by her older siblings. (§ 300, subd. (j).)

[4]     As discussed *post*, Ez. was not included in the same permanent plan as siblings Er., Ed., and Ek. He therefore is not a party in this appeal.

2

refused all contact with Mother for about a year, and wanted to be adopted by a nonrelative extended family member (NREFM). Three-year-old Ed. and two-year-old Ek. were living with paternal relatives in Arizona, were thriving in their care, and paternal relatives wanted to adopt both girls but would not agree to a legal guardianship. On April 19, 2022, the court terminated Mother's parental rights as to Er., Ed., and Ek., and Father's rights as to Ed. and Ek.

On appeal, Father alone claims the juvenile court erred in refusing to apply the parental-benefit exception to adoption as to Ed. and/or Ek. He also joins in Mother's sole claim on appeal that the court and Agency did not comply with the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) based on their failure to inquire with "extended family members" whether Er., Ed., and/or Ek. were of Native American ancestry.

As we explain, we disagree with Father's claim that the juvenile court erred in refusing to apply the parental-benefit exception to adoption as to Ed. and/or Ek. However, we agree with Mother and Father, as does Agency, that a conditional remand is warranted to ensure compliance with ICWA. In all other respects we affirm the dispositional order of the court.

## FACTUAL AND PROCEDURAL BACKGROUND

On June, 27, 2019, Agency received a referral concerning alleged physical abuse by Mother against Er., Ez., and Ed. The reporter stated Mother "beat" the children with an electrical cord on June 25, leaving marks on their backs, arms, and legs; that a day later, Mother and maternal grandmother Janine F. (MGM) had a physical altercation in the children's presence that required police involvement; and that Mother often called the children "names," "put fear into them," and had a prior case in Arizona involving a child welfare agency.

3

On or about July 23, Agency filed petitions on behalf of Er., Ez., and Ed. under section 300, subdivision (a); and the juvenile court issued protective custody warrants for the children.

### *Detention*

Agency's July 24, 2019 detention report recommended the juvenile court make a prima facie finding on the petitions; that the children be detained outside Mother's care; and that Mother have supervised visitation. At the time of the report, the whereabouts of Mother and the children were unknown, as she refused to disclose their location to Agency.

The detention report referenced Mother's prior history with a child welfare agency. In mid-May 2018, a dependency case was opened in Arizona for Er. and Ez., who were present when Mother assaulted Father with a baseball bat. It was further alleged that Mother was using methamphetamine and driving under the influence; had attempted suicide and had been hospitalized as a result; and had a history of domestic violence, including attempting to run over Father with her car while the children were inside the vehicle. The welfare agency took the children into protective custody due to Mother's arrest and incarceration, where they remained out of her care until late July 2018.

The Arizona welfare agency reported Mother had completed services "but was resistant," and that the agency had "difficulties" maintaining contact with Mother to check on her and the children. The Arizona dependency action was closed in February 2019. A social worker from the Arizona welfare agency stated Mother had a " 'serious significant history' " of violence against others including Father.

The detention report summarized the circumstances that led to the current detention. On June 27, Agency received a referral regarding

4

Mother's alleged physical abuse of Er. and Ez. among other concerning allegations. Agency made in-person contact with Mother, who, without Father, had moved her family from Arizona to California in March 2019.

Mother reported the Arizona dependency arose from Father's domestic violence. Mother denied physically abusing the children. An Agency social worker conducted a "body check" of the children and found signs consistent with current and past physical abuse, including bruising and scarring. With Mother's permission, the social worker photographed the marks on the children.

During interviews with the social worker, the children reported Mother called them names including " 'asshole, bitch, dumb, and stupid.' " Er. (then aged eight) reported she often changed and fed sister Ed.; and during the interview the social worker observed Ez. wash a baby bottle and fill it with formula while Mother repeatedly insisted that Ed. was hungry. Ez. disclosed that Mother and MGM "hit each other with their fists 'a lot,' " and he often tried to separate them when they fought. Both Er. and Ez. denied Mother hit them with objects, claiming she only spanked them on their "butt[s]."

During her Agency interview, MGM reported Mother " 'beat[]' " the children with objects including an extension cord; that a day earlier, Mother had beaten Ez. with a belt; and that Mother screams at the children "all day and [they] are terrified of [her]."

Agency returned to the family home on June 28. Mother promised to refrain from engaging in physical violence in front of the children and physically disciplining them, and agreed to allow Agency to conduct unannounced home visits for body checks of the children.

Agency also interviewed maternal grandfather Randal F. (MGF) and maternal aunt Alyssa F. (MA). MA reported that Mother also had been

5

involved with a child welfare agency in Texas after Mother slapped Er. in the face when the child was four years old. MGF and MA both claimed Mother had "anger issues"; and MGF stated Mother would "lock the children out of the home and make them climb in and out of the window" to gain entry.

Agency contacted Mother in early July. Mother confirmed she was not physically disciplining the children but that Ez. had been " 'outright defiant and the only thing [she has] is yelling and cussing,' " while repeatedly telling the social worker the child " 'needed his ass whooped multiple times.' " Mother declined parenting classes offered by Agency, suggesting it was Ez. who needed " 'obedience classes.' "

On July 11, Agency social workers met with a doctor from the Chadwick Center of Rady Children's Hospital who conducted a "paper consult" of the children, which included reviewing the photographs taken by Agency. The paper consult was necessary because Mother repeatedly refused in-person evaluations of the children. The doctor opined " 'loop' " marks on Ez.'s back and abdomen were consistent with an " 'inflicted injury' " from a " 'flexible object, such as a belt or cord,' " and was " 'definite evidence of abuse.' " The doctor also found these marks on Er. and reached the same conclusions; and found a thigh bruise on young Ed. " 'concerning for physical abuse such as a grab.' "

The doctor also opined Mother was " 'neglectful' " in expecting her other children to care for sibling Ed., noting it was unsafe because baby formula " 'must be made in specific ratios and incorrect mixing of formula can lead to infections, seizures, and poor growth in the infant.' " The doctor added the children were at risk for long-term negative effects as a result of physical discipline and exposure to violence; and that these effects included

6

" 'aggressive behavior, mental health disorders, cognition problems, and permanent alterations in brain architecture.' "

In mid-July, Agency on at least three occasions attempted telephone contact with Father, after Mother claimed she had no information regarding his whereabouts. In addition to leaving Father voicemails, Agency also sent an unable-to-locate letter to his last known address.

At the July 24 detention hearing, Agency informed the juvenile court that protective custody warrants for the children had not been executed because the family's whereabouts remained unknown. On July 30, 2019, the children were detained in protective custody after Agency located them at a rescue mission in Los Angeles. At a special hearing held on August 8, the juvenile court found Agency made a prima facie showing that Er., Ez., and Ed. were persons described under section 300, subdivision (a), and ordered the children detained in out-of-home care.

Mother gave birth to daughter Ek. on August 12, 2019. On August 28, Agency filed a petition under subdivision (j) of section 300 on behalf of Ek. A day later, the juvenile court also ordered Ek. detained in out-of-home care. Father's whereabouts remained unknown, despite Agency's best efforts to contact him. Agency noted he then had an active warrant issued by an Arizona court.

### *Jurisdiction/Disposition*

Agency's September 23, 2019 jurisdiction/disposition report recommended the juvenile court make a true finding on the children's petitions and they be declared wards of the court; that they remain in out-of-home care; and that Mother be offered reunification services and undergo a psychological examination.

7

Agency reported older children Er. and Ez. were together in licensed foster care, and younger children Ed. and Ek. were separately detained also in licensed foster care. The foster parents of Er. and Ek. reported the two children (then aged 8 and 6, respectively) had adjusted well, enjoyed school, listened to their foster parents' instructions, and there had been no emotional or behavioral issues. The foster parents of Ed. and Ek. likewise reported the two children (then aged 1 and about 2 months, respectively) were "doing well" and "happy," and Ek. only cried when tired or hungry.

Agency interviewed Mother shortly after she gave birth to Ek., while Mother and baby were residing in the rescue mission in Los Angeles. Mother denied any drug use, other than consuming alcohol on occasion, and claimed Father had "started slipping" with drugs and as a result, her "life has been falling apart." Mother was not participating in services offered by the rescue mission and had declined assistance to find permanent housing.

Agency conducted additional follow-up regarding Mother's involvement in the Arizona domestic violence incident in May 2018. A police report of that incident was attached to the jurisdiction/disposition report.

The police report provided Mother—then about seven months pregnant with Ek.—hit Father on the head and back about three or four times with a baseball bat while Er. and Ez. were present, injuring Father and resulting in her arrest for aggravated assault (domestic violence), and disorderly conduct (domestic violence). A child services agency took immediate custody of Er. and Ez., after it was determined no adult was available to care for them.

Also during this reporting period, Agency continued its efforts to contact Father. However, Agency was successful in locating fathers Dameon (Er.) and Erin (Ek.).

The record shows Er. and Mother testified at the contested October 15 jurisdiction/disposition hearing. The juvenile court admitted Agency's reports and Agency rested. After argument of counsel, the court found a "strong mixture" of direct and circumstantial evidence, along with Mother's documented history of prior abuse and neglect leading to intervention in Arizona, supported a true finding on the petitions. The court found Mother was "on the right path," but due to the seriousness of the allegations and her tenuous living situation, declared the children as dependents, removed them from her custody, and ordered her reunification services.

### *Six-Month Review*

During this reporting period, Mother participated in a psychological evaluation and was diagnosed with post-traumatic stress disorder (PTSD) and obsessive compulsive personality disorder. Individual therapy was recommended. Mother completed one intake session but refused to sign a disclosure form, leading to the termination of her therapy referral. She also was terminated from her visitation coaching program, after she refused to follow the rules and undermined the coach's authority, claiming the coach's information was "bullshit" and the children were being "abuse[d]" not by Mother but in foster care. Mother was participating in child abuse classes and continued supervised virtual and in-person visits with Er. and Ez. In its March 3, 2020 addendum, Agency expressed concern that Mother's lack of insight into the protective issue might prevent her from reunifying with the children.

On February 11, 2020, Father made his first appearance in the action during a special hearing. Mother confirmed that Father had resided with the family in Arizona for about four months, from September 2018 to January 2019. Father took a court-ordered paternity test confirming he was Ek.'s

9

biological father.  The juvenile court found he was the presumed father of Ed., and authorized service referrals and supervised visitation with Ed. and Ek.  Father in late February sought placement of Ed. and Ek. with him, or alternatively, an order placing them in a new licensed foster home.

Agency recommended the juvenile court deny Father's placement request because he was homeless and unable to provide a safe and stable residence for Ed. and Ek.; he wanted to remain in a relationship with Mother, despite their domestic violence; he had no concerns about Mother's parenting of the children or the protective issue, even after the juvenile court had found by clear and convincing evidence that she physically abused at least her two older children; and he had a long history of substance abuse, including as recently as 2019 when he was arrested for possession of methamphetamine.

During an Agency interview, Father admitted he had been arrested two times in Arizona for domestic violence of Mother, and recently for possession of methamphetamine.  Father reported he began using alcohol, marijuana, and heroin at about age 15, and methamphetamine at about age 18; that he discontinued using heroin when he was about 22 years old, after a near-death experience from an overdose; and thereafter, that he " 'self-treated' " for substance abuse while denying any current drug use.  Father informed Agency he completed a 52-week domestic violence education program in Arizona between 2018 and 2019.

Father had two children from a previous relationship in Arizona.  He was unsure whether he was still legally married to their birthmother; and was uncertain of the status of his custody/visitation over those children.

Father reported he was currently homeless and sometimes slept in Mother's car.  When questioned where he would live if Ed. and Ek. were placed with him, Father suggested Agency could provide him "Section 8"

housing. Agency explained that Father was not yet eligible for a housing referral because there were other barriers to reunification including his substance abuse and domestic violence; and that he needed to make progress in services, demonstrate behavioral change, and progress in visitation before becoming eligible for a housing referral.

In its April 14, 2020 status review report prepared in connection with the six-month review hearing, Agency continued to recommend Mother and Father receive reunification services. At the time of this report, Er. and Ez. were living with a NREFM, where they had been placed in March 2020, and Ed. and Ek. were in licensed foster care, where they had been placed in October 2019. Mother and Father remained homeless and in a relationship; and Father was just beginning to participate in services.

Due to the pandemic, Father's request that Ed. and Ek. be placed in his care was not heard until late May 2020. Agency continued to recommend against a change in placement, as did the children's guardian ad-litem/counsel, who noted the two girls were thriving in the caregivers' home.

The juvenile court denied Father's placement request, finding he lacked stable housing, had yet to fully engage in services, and had "difficulty" maintaining a parent-child relationship with Ed. and/or Ek.

In its July 17 addendum, Agency reported Father was referred to therapy in lieu of a domestic violence program but had yet to meet with a therapist. Father also was referred to a substance abuse specialist in February 2020, but was a no-show for his intake appointment. In June 2020, Father refused to drug test and would not consent to randomized drug testing. He also resisted undergoing drug counseling, while accusing Mother of using " 'meth and heroin.' " Mother tested in early July and the results were negative for drugs. In August, Father also submitted to a drug test

11

after Mother accused him of being "high" during a combined visit with the children. Father's drug test came back negative.

On August 10, Mother obtained a temporary restraining order (TRO) against Father, alleging abuse between March and August 2020. The TRO also protected Er. and Ez. On August 19, police arrested Father for violation of the TRO, as well as for disorderly conduct/lewd act and control of drug paraphernalia.

On August 21, Agency received approval for the placement of Ed. and Ek. in the Arizona home of paternal aunt Alisha O. and her husband pursuant to the Interstate Compact for the Placement of Children (ICPC). Agency noted that, although Father was in the initial stages of services, he had demonstrated "minimal and inconsistent efforts," as his criminal activity had interfered with both his case-plan service participation and visitation of Ed. and Ek. Agency also found concerning that he remained "aligned" with Mother and continued to lack insight regarding the protective issue that led to dependency.

At the contested six-month review hearing, guardian ad-litem/counsel for the children joined in Agency's recommendation that it would be detrimental to return them to either parent, noting that Father had made minimal progress in services and visitation with Ed. and Ek., and was currently in custody; and that Mother, while making some progress in services, was still having supervised visits and there were concerns regarding her behavior during some visits.

The juvenile court found by clear and convincing evidence that return of the children to the care of Mother and/or Father would be detrimental; that both were offered and provided reasonable services to assist them in reunification; and that both had made "some progress" with their case plan.

12

The court ordered the children to continue as dependents and remain in their current placements.

## 12-Month Review

Agency's October 13, 2020 status review report recommended Mother and Father continue to receive reunification services to the 18-month date. At the time, Er. and Ez. were living at Polinsky Children's Center (Polinsky), where they had been placed in August 2020; and Ed. and Ek. remained in the same foster care home, where they continued to thrive. The caregivers of Ed. and Ek. applied for and received de facto parent status.

During this reporting period, Mother remained homeless, unemployed, and denied having any contact with Father after the TRO issued. Father was released from jail on September 4, and also remained homeless and unemployed. He likewise denied having any relationship with Mother, but remained open to reconciliation.

Agency noted Mother had recently begun demonstrating positive behavioral changes in her visits with the children. Regarding Father, Agency noted he had made minimal progress in services, and thus, there was not a substantial probability he would reunify with Ed. and/or Ek.

Agency's November 4 addendum noted Mother then was having unsupervised visits with Er. and Ez. at Agency's office, which had gone well. However, during a supervised visit on October 28, Mother and Er. engaged in a verbal altercation after Mother became upset at Er. for wearing colorful lip gloss. Ez. and Ed. were also present at the visit. The following day, an Agency social worker spoke to Mother, who reported Er. had been " 'disrespectful,' " " 'uncooperative,' " and had " 'slapped [Mother's] hand.' " Mother admitted asking the visitation supervisor "at what point [was] she able to use physical discipline." The Agency social worker clarified that

physical discipline was never acceptable, to which Mother responded the parenting techniques she was learning in services "only allow[ed] the minor's behavior to escalate."

The Agency social worker also spoke with the visitation supervisor about the October 28 altercation between Mother and Er. The visitation supervisor believed Er. was merely acting like a typical nine year old; confirmed that during the altercation, Mother had asked in a " 'genuine way' " when it would be okay for her to spank the child and was also told it was never okay; and opined that Mother struggled with the need to " 'control the children's behavior,' " her expectations of them were "unrealistic," and she engaged in "power struggles" which adversely affected them, particularly Er. The social worker also spoke with Er., who reported she was scared of Mother.

The November 4 addendum included a summary of 34 special incident reports (SIRs) documented by Polinsky involving Er. and/or Ez. between August 9—when their placement began—and October 9. This multipage summary included incidents in which Er. and Ez. attempted to leave Polinsky without permission; engaged in physical altercations with, and cursed at, Polinsky staff and other residents; threatened self-harm; and vandalized Polinsky property, including breaking tables and using table parts as weapons against staff and residents.

Regarding Father, Agency noted he had not yet provided his substance abuse provider with a form to allow Agency to follow up on his progress. Additionally, Agency expressed concern over Father's attempts to search for, and his decision to visit, the home of the de facto parents. Agency encouraged Father to focus his time and attention on his case plan if he hoped to reunify with Ed. and Ek. by the 18-month date.

14

At the November 4 hearing, the juvenile court ordered additional services for Mother and Father to the "18-month mark." Because Mother was actively participating in services, the court found Father's request for placement of Ed. and Ek. with paternal relatives in Arizona "premature," as it would interfere with Mother's visitation of the children during reunification.

Agency's December 16 addendum in support of the continued 12-month review hearing recommended that Father's services be terminated; that Ed. and Ek. remain living with their de facto parents, where they continued to thrive; and that Er. and Ez. continue living at Polinsky or in licensed foster care.

Regarding Father, the December 16 addendum noted he had been unable to engage in therapy, continued to deny the protective issue, and made " 'bizarre statements' " that an Agency social worker was trying to " 'sell[]' " Ed. and Ek. During this reporting period, Father requested services for domestic violence as a result of a criminal protective order (CPO) issued by a criminal court, which expires on September 4, 2023.

On November 19, Agency was informed that Father had tested positive for methamphetamine in late October and had been discharged from his outpatient substance abuse program after exhibiting " 'very hostile' " and " 'aggressive' " behaviors towards counselors, other staff, and group members. The counselor recommended Father seek anger management classes and therapy.

On November 24, Father agreed to drug test but failed to appear for testing. That same day, Agency received notification from one of the visitation centers that Father's visits had been terminated due to his "non-compliance and threat[s] to the visitation monitor."

15

During this reporting period, Agency reported 40 additional SIRs documented by Polinsky involving Er. and/or Ez. In late December, Mother began overnight visitation with Er. and Ez. Also in December, Mother began unsupervised visits with Ed. and Ek.

At the December 16 continued 12-month review hearing, the juvenile court found Mother was making "impressive" progress in services and as a result, modified her visitation to allow Er. and Ez. unsupervised overnight visits, and to extend those visits to include a 60-day trial visit.

Agency's January 13, 2021 addendum continued to recommend that Father's services be terminated. Agency noted Father had been asked to drug test in December 2020 and as before was a no-show. However, Father did test in early January 2021, with the results then "pending." During a supervised in-person visit on December 18, Father was asked by a social worker to discontinue watching movies and cartoons with Ed. and Ek., as Agency preferred more parent-child interaction during visits. Father became angry, put his phone away, and swore at the Agency social worker. Regarding Mother, Agency found she was still on track to reunify with the children.

At the continued 12-month review hearing on January 13, 2021, the juvenile court terminated Father's reunification services;[5] and continued Mother's services to the 18-month date, which it noted was only a few weeks away. The court found both Mother and Father had consistently and regularly visited with the children; that Father had not made significant progress in resolving the issues that led to the detention of Ed. and Ek.; and that he had not demonstrated the "capacity and ability . . . to complete the

---

[5] Father appealed the order terminating his reunification services to this court, which order was affirmed on May 26, 2021 in case No. D078485.

16

objectives of the treatment plan and provide for each child's safety, protection, physical and emotional wellbeing."

### *18-Month Review*

Agency's January 25, 2021 status review report recommended the children remain dependent; that they be placed with Mother once Agency verified she had stable housing; and that she be offered family maintenance services.

During this reporting period, Mother remained homeless, alternating between sleeping in her car and, when having overnight visits with Er. and Ez., staying in hotels. Mother, however, independently sought a low-income housing voucher where she could live with all four children. Once Mother obtained stable housing, Agency recommended a "gradual transitional plan," in which the two older children would first be placed with her, followed by the placement of the two younger children.

Agency noted that in the most recent reporting period, there were 27 documented SIRs involving Er. and/or Ez. at Polinsky.

In its February 22, 2021 addendum, Agency continued its recommendations from its January 25 addendum, noting Mother still had not obtained stable housing but hoped to have her housing application approved by late February.

During this reporting period, Agency also sought a change in placement for Ed. and Ek. due to what Agency alleged was the de facto parents' "negative behaviors" toward Mother and/or Father and their relatives, which Agency noted had "remained constant" and had recently "escalated." Agency provided several examples of the de facto parents' statements that it found "offensive, derogatory and inappropriate."

17

The de facto parents' opposed Agency's decision to remove the two girls from their care, and subsequently petitioned the juvenile court to allow the girls to remain in their home until reunification with Mother. Father separately requested the immediate removal of Ed. and Ek. from the de facto parents and sought placement with Mother or at Polinsky.

Agency's addendum noted that between February 22 and March 25, there were 10 additional SIRs documented by Polinsky concerning Er. and/or Ez., including one incident that required police involvement.

On March 15, 2021, Mother moved into an apartment. A week later, the juvenile court placed Er. and Ez. with her and ordered family maintenance services. It also denied the request to remove Ed. and Ek. from the de facto parents, noting there was no protective issue, and followed Agency's recommendation that the two younger children have overnight visits with Mother but not be immediately placed in her care.

On March 29, at Mother's insistence the juvenile court ordered a 60-day trial visit for Ed. and Ek. with Mother. The court cautioned Mother about taking on too much too fast, noted Agency's plan to "transition" the placement of the younger children with Mother was a good idea but that Agency's plan was "not legally required." The court continued the 18-month review hearing for 30 days.

### *Second Removal and Supplemental Petitions*

On April 6, Agency detained Er., Ez., Ed., and Ek. at Polinsky and filed supplemental petitions to remove Er. and Ez. from Mother after receiving a referral on its child abuse hotline.[6] The reporter alleged Mother had been screaming at the children, telling them, " 'This is why nobody wants you.' "

---

[6] Agency did not file supplemental petitions on behalf of Ed. and Ek. because their placement with Mother was on a trial basis only.

and " 'You want to be put back in foster care [so] someone can rape or hurt you?' " Er. at one point was overheard yelling, " '[I] cannot breathe' " and " 'get off [me].' " Neighbors also reported hearing loud noises coming from inside Mother's home, which at one point caused items to fall from neighbors' walls.

Prior to removal, Agency contacted Mother. On April 5, she told Agency she was having to "chase" after the children and was trying to "figure out how to change their unruly behavior."

The following day, Agency again contacted Mother. She reported the night before Er. had taken off her shirt and ran outside, refusing to return home. A neighbor intervened and brought Er. home, which led to a physical altercation between Mother and the neighbor that required police intervention. The police later returned to Mother's apartment at about midnight, after Mother and the same neighbor began screaming and fighting with each other. A resident assistant from the apartment complex sat with Er. for about two hours during what turned out to be three visits by police to Mother's home. Er. confided she was afraid of Mother; that Mother was " 'too controlling' "; and that Mother had allowed Father back into their home, which police also confirmed.

During the interview, Mother denied Father had been in the family home and that she had put her hands on Er.'s neck. Mother told Agency Er. kept trying to run away, was "defiant" and "vindictive," and although she loved Er., believed the child should be temporarily removed from her care and receive services.

An Agency social worker showed the resident assistant a picture of Father. The assistant confirmed Father had been at Mother's home a day earlier. Er. likewise confirmed Father had been inside the home.

19

Agency made in-person contact with Er. on April 6. She explained that at bedtime on April 4, Mother told her to go into her room and close the door. Er. yelled at Mother because she did not like her door closed at night. Father was in the home and intervened. He reiterated Er. needed to follow Mother's instruction, and forcibly attempted to close the door. Er. in response put her foot in the doorway and held the door handle. Mother grabbed Er. by the neck, slapped her at least twice in the face, then picked her up and threw her on the floor, while calling her " 'crazy and out of her mind.' " Mother next " 'popped' " Er. in the mouth a "few times." Er. also discussed the incident the night before that led to police intervention. Er. stated it began after telling Mother she wanted to return to Polinsky.

In its addendum, Agency recommended the children remain at Polinsky, the juvenile court make a prima facie finding of the need to continue their detention outside of Mother's care, and the court order supervised visitation for Mother. In support, Agency noted Mother acknowledged her inability to redirect and discipline Er., which had led to physical and verbal altercations between them; that between April 4 and 6, police had gone to Mother's home "numerous" times to help with "safety"; that Ez., Ed., and Ek. had witnessed Mother's physical/verbal aggressive interactions with both Er. and neighbors; and that Mother had allowed Father into the family home, in violation of the restraining order.

At the April 13 hearing, the juvenile court found Agency had made a prima facie showing of the need to detain Er. and Ez. out of Mother's care. The court vacated the order for the 60-day trial visit for Ed. and Ek.; and ordered Mother have liberalized supervised visitation with the children.

During the April 13 hearing, the guard-ad-litem/counsel of Ed. and Ek. informed the court that the two children had been moved from Polinsky to a

20

new licensed foster care home. After hearing argument, the court denied the de facto parents' request to have the two girls returned to their care.

Beginning on July 6, the juvenile court heard Agency's supplemental petition to remove Er. and Ez. from Mother and the contested 18-month review hearing of Ed. and Ek. At the time, Er. and Ez. were living at Polinsky, and had just recently begun spending weekends at MGM's home. Er. was recommended for placement in a short-term residential therapeutic program based on a recent PTSD diagnosis, after her second removal from Mother. However during the multiday hearing, Agency changed its recommendation for Er. after a NREFM was approved for her placement. Ed. and Ek. remained living in a neutral foster care home.

At the outset of the combined hearing, Agency advised the parties that the ICPC for placement of Ed. and Ek. with paternal relatives in Arizona had been approved for a second time. The court admitted Agency's January 25, 2021 status review report; 12 addendum reports; and the April 9 detention report for Er. and Ez.

After hearing witness testimony including from Mother, Agency social workers, MGM, one of the de facto parents, and Ez. (in writing by the parties' stipulation), the juvenile court (1) denied the de facto parents' request that Ed. and Ek. be returned to their care, finding that it was not in the children's best interest; (2) granted Father's request to rescind and terminate the de facto parent status of the former caregivers of Ed. and Ek.; (3) granted Agency's supplemental petitions and removed Er. and Ez. from Mother; (4) placed Er. with the NREFM and Ed. and Ek. with paternal relatives in

Arizona; (5) terminated Mother's reunification services; and (6) set the case for a section 366.26 hearing.[7]

### Agency's Permanency Assessments

In its November 4, 2021 section 366.26 report, Agency requested a 90-day continuance to allow it to assess the most appropriate permanent plan for the children. At the time Er. was continuing to reside with the NREFM; and Ed. and Ek. remained in the home of paternal relatives, where they had been placed on July 27, 2021. The November 4 report summarized the number and type of placements of Er., Ed., and Ek. since entering dependency: Er. had been in seven placements, including most recently with the NREFM;[8] Ed. ten, including the most recent placement with paternal relatives;[9] and Ek. nine.[10]

The November 4 report included a summary of two virtual visits between Father and Ed. and Ek. in October 2021. During one of the visits, an Agency social worker reported that Father's eyes were dilated, his speech

---

[7] In case No. D079252, Father and Mother separately filed a notice of intent to file a petition for writ of mandate under California Rules of Court, rule 8.452, challenging the juvenile court's order. Counsel of each parent subsequently notified this court that petitions would not be filed because there were no viable issues for writ review, leading to a dismissal of the action.

[8] Three of these seven placements were at Polinsky, one was with Mother in April 2021, one was in licensed foster care, and another was with a different NREFM than Er.'s then-current placement.

[9] Four of Ed.'s 10 placements were at Polinsky, one was with Mother in April 2021, one was with the (former) de facto parents, and the rest were in licensed foster care.

[10] Ek.'s placements were the same as Ed.'s, other than Ed.'s first placement at Polinsky on July 30, 2019, before Ek. was born.

rapid, and he continually licked his lips. During the other visit, Father appeared drowsy, and had trouble holding up his head. At the conclusion of both visits, Ed. cried and went to paternal relatives for comfort.

With regard to Ed., Agency noted she struggled with "transitions, cries easily, and often hits or pushes her sister" Ek. Ed. also had sleeping and eating issues, and it was recommended she undergo an annual developmental screening.

With regard to Ek., Agency noted she also struggled with "transitions," had "disorganized attachment," and lacked " 'stranger danger.' " Ek. also struggled with "tantrums, meltdowns, eating, sleeping, aggression toward others and self-regulation," and it was recommended Ek. start therapy as soon as possible.

Agency in its February 3, 2022 addendum recommended the permanent plan of adoption for Er., Ed., and Ek., and sought a 90-day continuance to make a recommendation for Ez., as Agency attempted to locate his father who resided out-of-state.

During this reporting period, Er. continued to refuse any contact with Mother, who also had a CPO issued by a criminal court in favor of Er. due to the April 2021 incident. The CPO provided that any visits between Er. and Mother should occur only in a therapeutic setting. Er. reported she wanted to be adopted by her current NREFM, who also wanted to adopt Er.[11] Agency's adoptions social worker Jessica Carter assessed Er. as being both generally and specifically adoptable.

Ed. and Ek. remained living in Arizona with paternal relatives. They wanted to adopt both girls but were not interested in a legal guardianship, as

11    Er.'s father Dameon was also in favor of adoption as the permanent plan for Er.

23

the caregivers believed the two girls needed the permanency offered by adoption. Ms. Carter assessed the two girls and determined they also were both generally and specifically adoptable.

Regarding Ed., Ms. Carter noted she was generally adoptable as she had met all of her developmental milestones despite multiple placement disruptions, and was "healthy, talkative, [and] friendly." Ed. was also deemed specifically adoptable because paternal relatives wanted to adopt her and they had an approved ICPC home study.

Agency's assessment of Ek. was similar to sibling Ed. Ek. was generally adoptable, as she was a healthy two year old who also was meeting all of her developmental milestones. Ek. was also specifically adoptable like her sister Ed.

During this reporting period, Father was having once-a-week, one-hour virtual visits with Ed. and Ek. The caregivers told Agency they were "apprehensive" about Father's request for in-person visits with the girls.

Father was approved for an in-person visit with Ed. and Ek. on Thanksgiving Day 2021 and for the day following. However prior to the visits, Father was incarcerated for allegedly violating Mother's restraining order and was not released until December 2, causing him to miss both visits.

Agency's February 3 addendum summarized two virtual visits between Father, Ed., and Ek. in mid-December 2021. In both visits the girls called him " 'Daddy' " when he came on screen and Ed. cried when Father said he loved and missed them. At the end of one of the visits, Ed. told Father, " '[N]o, daddy don't go.' "

Agency acknowledged there was a "level of strength" in the relationship between Ed., Ek., and Father, but found the relationship was not "significant enough to indicate detriment" if parental rights were terminated. Ms. Carter

24

noted that, although Ed. tended to cry at the end of visits with Father (and Mother), the child was "able to recover quickly with food, toys, and other distractions"; and that throughout dependency, Ed. had "always struggled with 'goodbyes,' no matter who[] the visit is with, as she has experienced multiple placement disruptions."

In her report, Ms. Carter noted she had multiple conversations with paternal relatives regarding the permanent plan of adoption or legal guardianship for Ed. and Ek. The caregivers believed that adoption was in the girls' best interest and were against a legal guardianship. The caregivers reported both girls had adjusted well since their placement in July 2021; they called the caregivers " 'Mom' " and " 'Dad' "; and they sought out the caregivers for "affection and reassurance." Agency recommended adoption as the preferred plan for the two girls, noting they were thriving in their current placement, and they needed permanency and stability in light of their multiple placements during dependency.

Agency's March 22, 2022 addendum described a four-hour, in-person supervised visit in Arizona between Father, Ed., and Ek. At the beginning of the March 20 visit, both girls appeared "very excited" to see Father, calling him " 'Daddy' " while running up to and hugging him. During the visit they ate snacks provided by Father, watched movies, and played with dolls Father had brought as gifts. As the visit continued, Ed. punched Father in the face for no reason and Ek. repeatedly kicked him in the leg. Ed. also bit father on the back and at one point, grabbed Father's car keys and announced she was leaving to go to " '[c]hurch.' " Ed. also threw toys at Father's face and at her sister; pulled wipes from a container and began wiping everything in the visitation room; hit Father after he threw the wipes away; and, while playing "doctor," stabbed Father in the leg with a toy syringe.

25

When lunch arrived, Ed. took her food and threw it on the floor. During lunch Ed. demanded more juice. When Father told her no and poured water into her glass, Ed. took a sip and, after realizing it was water, threw the cup across the room. A short time later, Ek. also threw her food on the floor and repeatedly kicked Father when he also refused to give her more juice. During bathroom visits for Ed., Ek. unraveled the toilet paper into the hallway. Throughout the visit, Father struggled to control and redirect both girls. At the end of the visit, the visitation supervisor observed the room was a "disaster."

Agency noted that Ed. and Ek. were both in therapy and had been diagnosed with adjustment disorder. A previous therapist had noted Ed. experienced "trauma exposure" and "significant attachment disruption," as evidenced by her reaching out to strangers, calling her new caregivers " 'mommy' " and " 'daddy' " within a day, and telling her caregivers, " 'I thought I lost you.' "

In its March 22 addendum, Agency noted there was some level of emotional attachment between Father and Ed.; that Ed. and Ek. enjoyed their supervised visits with Father; and that during in-person visits he met their immediate needs by bringing them food and toys. Agency nonetheless noted Father struggled to parent his two daughters during a four-hour time frame, despite the visit being supervised and limited to a single room. Agency followed its previous recommendation, concluding the benefits of adoption outweighed any parent-child relationship between Father and Ed. and/or Ek.

On March 21, 2022, Father once again petitioned to have Ed. and Ek. placed in his care. In support, Father stated he had been participating in

therapy, substance abuse treatment, a domestic violence support group, and was actively seeking stable housing.

Two days later, the juvenile court denied Father's request, finding he failed to make a prima facie showing on his petition. In support, the court noted Father was "very early on in his process for long-standing significant issues in his life"; that his visits with Ed. and Ek. had remained supervised; that he appeared to have "great difficulty" controlling their behavior during visits; and that both girls had had "highly traumatized experiences in their life" and, due to their young age, were unable to verbalize that trauma but were doing so in "their acting-out behavior."

Agency in its March 30 addendum continued to recommend termination of parental rights and the permanent plan of adoption. This report included another detailed, multipage summary of an in-person visit between Father, Ed., and Ek. on March 26. As before, both girls met Father with hugs and called him " 'Dad.' " Also like the previous in-person visit, both girls acted out, including Ed. hitting Father in the face with her hand and toys, biting him on the arm, kicking him, and swinging toys at him.

Also during this visit, Ek. threw colored pencils at Father and stabbed him with one. She also slapped Father in the face, smashed food on the floor, stomped on a puzzle box, and threw a cup in his face. As was the case in the prior visit, the family left the visiting room a "mess." At the end of the visit, Ed. cried and said she wanted to see Father tomorrow, threw food on the floor, and slapped Father in the face.

Father also had supervised in-person visits with Ed. and Ek. on April 2 and 9 and the visits were similar to those in March. During the April 2 visit, both girls were happy to see Father and called him " 'Daddy' " while hugging him. However as before, during this and the April 9 visit both girls acted out,

repeatedly hitting Father and each other with their hands and toys; throwing items at Father and each other; and engaging in other unruly behaviors, such as throwing food on the floor, refusing to return to the visitation room, and damaging items in the room. At the end of the April 2 visit, Ed. told Father she wanted to go home with him, to which Father responded, " 'I want you to come home with me too baby, soon I hope.' "

Agency in its April 15 addendum recognized that, although Ed. and Ez. loved Father (and Mother) and looked forward to visits, adoption continued to outweigh any parent-child relationship. Ms. Carter opined the two girls were in "desperate need" of "permanency, stability, unconditional positive love and acceptance" that only adoption could offer.

### *366.26 Hearing*

#### **Witness Testimony**

At the April 15, 2022 hearing, the juvenile court admitted Agency's November 4, 2021 section 366.26 report and the various addenda to this report summarized *ante*. Agency rested.

On cross-examination, Ms. Carter testified she made recommendations on Agency's behalf for the permanent placement of the children.[12] She noted Ed. and Ek. had been in their current placement since July 2021. During this placement, paternal relatives had been asked to complete a parenting class and had been given referrals for in-home behavioral services, after Ed. disclosed she had been spanked on the bottom by the mother-in-law of one of

---

[12] Because Mother on appeal does not challenge termination of parental rights as to Er., we find it unnecessary to discuss Ms. Carter's testimony regarding this child.

the caregivers and Mother had reported seeing bruising.[13] Ms. Carter reported the spanking incident to the Agency-equivalent in Arizona but was informed it did not qualify as abuse.

Ms. Carter next contacted a social worker in Arizona who spoke to paternal relatives about refraining from spanking foster children. At Agency's request, the caregivers took the two girls to a doctor, who reported no signs of bruising or neglect.

Ms. Carter noted an ICPC social worker in Arizona also agreed to make announced and unannounced visits to paternal relatives' home to ensure the safety of Ed. and Ek.; that the girls were also observed by Agency-equivalent social workers in Arizona during in-person supervised visits with each parent; and that Ms. Carter also had the opportunity to view the two girls during virtual visits. Ms. Carter testified she had no concerns that Ed. and/or Ek. were being abused or neglected by paternal relatives. However, she noted the caregivers at times yelled at the two girls and their other two children. The caregivers were cautioned to refrain from yelling at Ed. and/or Ek.

Ms. Carter also testified regarding her observations of virtual visits between Father, Ed., and Ek. She noted that the girls were excited to see Father, expressed sadness when the visits ended, and he was appropriate during the visits. Father also comforted the girls when the visits were ending, telling them he loved them and would visit them soon.

---

[13] Mother also was concerned about a cut above Ek.'s eye that she observed during a visit. An Arizona social worker and Ms. Carter separately spoke to the caregivers about this injury, who reported it occurred when Ed. hit Ek. with a book.

Despite the positive interaction between Father, Ed., and Ek., Ms. Carter observed symptoms of adjustment disorder during their visits, noting the visitation logs described some of those visits as "chaotic." Ms. Carter testified Ed. and Ek. had adjusted to their "family environment," but appeared confused by the changes in their lives when they visited with Father (and Mother). Ms. Carter opined the two girls needed "security, stability, [and] consistency of just knowing that they're going to stay in a home and not be confused of where they're going to go again." She thus recommended adoption as the permanent plan for Ed. and Ek.

Mother also testified at the section 366.26 hearing, as did Father. Based on the issues raised in this appeal, we focus primarily on his testimony.

Father testified that before this dependency, three-year-old Ed. had spent about six months in his care; and that two-year-old Ek. had never been in his care, as the child was detained shortly after her birth in August 2019, prior to his February 2020 appearance in this action.

Father described Ed. as being "sensitive," "loving," "playful and sweet," but noted she sometimes had problems controlling her emotions; and described Ek. as being "very independent" and "assertive." Father testified he had a close relationship with both girls, which was important to him because growing up he lacked such a relationship with his own parents.

While receiving services, Father participated in parenting classes with Ed. but not Ek., who was too young. Father learned different parenting tactics including the use of timeouts that he found effective with both girls; and about the effects of childhood trauma from spanking, yelling, and domestic violence in the home, which he added could lead to psychological issues later in life.

30

Father testified about his virtual and in-person visits with the girls, including their frequency and duration. He noted both girls were always happy to see him and called him "Daddy" when they greeted him; that the visits were a "good time" for all, as they ate, played, laughed, and giggled; and that for virtual visits in particular, it became difficult when they ended. Father admitted the behavior of the girls "fluctuate[d]" during the visits, as sometimes they were "calm" and other times "rowdy." Father believed the girls' behavior was sometimes the result of his own level of engagement with them, and that the calmer he remained the more calm they stayed.

Father expressed concerns about the safety of Ed. and Ek. in paternal relatives' home. Father claimed there was too much yelling in the home, which he overheard during video visits; that Ed. had come to a visit with scratches on her face and neck and a bruise over her eye; and that once the children were placed, his sister stopped communication, including giving him basic information about the girls' wellbeing. Father, however, stopped short of saying the injuries to his daughters went beyond "kids just being kids," acknowledging that the girls played aggressively.

Father believed that if his parental rights were terminated, the girls would feel "abandoned," "[l]eft alone with an uncertainty of what they did wrong." Father admitted he had made some "mistakes" in the past, but did not believe Ed. and Ek. should have to "suffer" for them. Father noted the number of placements of Ed. and Ek. during dependency, and claimed the only two people that had always been there for them, "one way or another," were him and Mother.

**Juvenile Court's Ruling**

The juvenile court considered Agency's myriad reports and the "age-appropriate comments and conduct of the each of the children" in finding by

31

clear and convincing evidence that Er., Ed., and Ek. were each likely to be adopted.

Regarding Er., the court found her age-appropriate perspective of wanting to be adopted by the NREFM and not wanting a relationship with Mother "mature," and supported its finding Er. was adoptable. The court recognized Er. had been "traumatized greatly by her earlier life experiences."

Regarding Ed. and Ek., the court noted the "great number of placements" for the two girls, which led to their "difficulty in establishing the trust and security to form attachments." The court recognized the concerns regarding discipline by paternal relatives but found no evidence they were responsible for any injury to the girls, noting the reports instead showed the girls demonstrated a "level of aggression" and "negative interaction" toward each other that likely caused each other injury.

The court found the two girls showed "improvement" in their ability to "self-regulate their emotions while in the current setting with [paternal relatives], [and] their ability to interact as siblings in a far more healthy level" despite their "attachment difficulties" and "emotional confusion." The court also found paternal relatives wanted to adopt the two girls; that the girls felt safe and secure with their caregivers; and that there was no impediment to finalizing their adoption.

Regarding termination of parental rights, as relevant here[14] the court found Father bore the burden to establish by a preponderance of the evidence

[14]    Given the issues on appeal, we find it unnecessary to discuss application of the parental-benefit exception to adoption for Mother. However, we note in passing the juvenile court found Mother (1) did not meet her burden on any of the three elements of this exception as to Er.; and (2) met only element one—regular visitation—for the exception to apply as to Ed. and/or Ek.

32

the three elements of the parental-benefit exception to adoption (discussed *post*). It noted Father carried his burden on element one, as he regularly visited Ed. and Ek. However, on elements two and three, the court found that there was not a "substantial[,] positive[,] emotional attachment" between him and Ed. and/or Ek. and that, on balance, the two girls would benefit more from adoption than by maintaining a relationship with him. The court thus terminated Father's parental rights as to Ed. and Ek.

## DISCUSSION

### I.

### Parental-Benefit Exception to Adoption

Father alone claims the juvenile court erred in finding the parental-benefit exception to adoption did not apply as to Ed. and/or Ek. We find no error.

#### A. *Guiding Principles and Standards of Review*

Where, as here, "a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception. What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*); see § 366.26, subd. (c)(1)(B)(i) [providing in part that the court shall terminate parental rights unless "[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to . . . [t]he parents hav[ing] maintained regular visitation and contact with the child and the child would benefit from continuing the relationship"].)

If the parent demonstrates these three elements, then the parental-benefit exception to adoption applies and the juvenile court should not terminate parental rights and instead select a permanent plan other than adoption. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-637; see *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption."].)

When reviewing the juvenile court's findings regarding the parental-benefit exception, we apply two different standards of review. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-641.) We review the first two elements for substantial evidence. (*Id.* at p. 639.) This standard requires us to determine if there is reasonable, credible evidence of solid value to support the court's order, resolving all conflicts in favor of affirmance. (*In re M.G.* (2022) 80 Cal.App.5th 836, 848 (*M.G.*).)

However, for the third element, we apply the abuse of discretion standard. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-641; *M.G.*, *supra*, 80 Cal.App.5th at p. 848.) For this element, the parent must show that terminating the relationship would be detrimental to the child when balanced against the countervailing benefit of an adoptive home. (*Caden C.*, at p. 633.) A court abuses its discretion when it makes an arbitrary, capricious, or patently absurd determination or its decision rests on an error of law. (*Id.* at p. 641; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *M.G.*, at pp. 848-849.) An appellant must affirmatively establish abuse of discretion, as it is never presumed. (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

**B.** *Analysis*

Father does not challenge the juvenile court's finding that Ed. and/or Ek. were adoptable. Agency likewise does not challenge the court's finding

that Father met the first element of the parental-benefit exception in that he maintained regular visitation and contact with the two girls. (See § 366.26, subd. (c)(1)(B)(i); *Caden C.*, *supra*, 11 Cal.5th at p. 632 [noting the first element of this exception is "straightforward"].)

## 1. Element Two

The juvenile court found Father did not meet his burden to show Ed. and/or Ek. would "benefit" from the continuation of the parental relationship. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632.) The focus of this element is "the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) For this element, a parent must show the child "has a substantial, positive, emotional attachment to the parent— the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, at p. 636.)

Here, we find substantial evidence supports the juvenile court's determination that neither Ed. nor Ek. would "benefit" from a continued relationship with Father. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632.) In particular, the court found that, while there were some positive attributes to the relationship, they were outweighed by other factors.

First, at the time of the section 366.26 hearing, Ed. was three years old and had lived in foster care for the majority of her young life. In addition, prior to dependency she had spent only about six months (or less)[15] with Father. As for Ek., she had never lived with Father or been in his care, as

---

[15] We note Mother previously had testified that Father had resided with Ed. and the family for only *four* months.

she was born in August 2019, after siblings Er., Ez., and Ed. had been detained. (See *Caden C.*, *supra*, 11 Cal.5th at p. 636 [in assessing whether a child has a "substantial, positive, emotional attachment" to a parent, a court may consider the child's age and the portion of the child's life spent in the parent's custody].)

In addition, Mother testified Father last lived with the children between September 2018 and January 2019. There is no evidence in the record that Father had any contact with Ed. between January 2019, when Mother moved the children from Arizona to California, and February 2020, when Father first appeared in the dependency action. Nor is there any evidence he had any contact with Ek. before February 2020.

Moreover, prior to appearing in this case, Agency over the course of months had left myriad messages for Father at his last known telephone numbers, including one that "had a voicemail greeting stating, 'Hey, this is Anthony,' " and had sent unable-to-locate letters to his last known address, in an effort to apprise him of the dependency action involving his two children. There is no evidence Father did not receive Agency's voicemail messages and/or unable-to-locate letters; nor did he ever explain why he did not appear in the dependency action until February 2020, almost seven months after its commencement and six months after Ek.'s birth. (See *M.G.*, *supra*, 80 Cal.App.5th at p. 848 [we draw all reasonable inferences in support of the juvenile court's findings].)

This evidence supports the findings that (1) for a not insignificant portion of the young lives of Ed. and/or Ek., Father had no contact with them (see *Caden C.*, supra, 11 Cal.5th at p. 632); (2) when he did have contact with Ed., other than a four- to six-month period when she was very young, it was always in a supervised setting; (3) his only contact with Ek. was during

36

dependency and was always supervised; and (4) therefore, there was not a "substantial" attachment between Ed. or Ek. and Father such that the relationship benefitted the two girls. (See *In re Mary C.* (2020) 48 Cal.App.5th 793, 801 (*Mary C.*) [a reviewing court considers "the evidence in the whole record in determining whether substantial evidence supports the termination of parental rights"].)

Second, substantial evidence supports the juvenile court's finding there was a "very unhealthy aspect" of the relationship between Father and Ed. and/or Ek. that outweighed some positive "attributes" displayed during visits. The court found there was a consistent level of dysregulation, confrontation, and "oppositional behavior" exhibited by Ed. and/or Ek. during visits, which were demonstrated by the two girls' "outright defiance, whether it's simply looking the parent in the eye and saying 'no,' [or] whether it's repeating the same conduct over and over . . . in a short period of time, notwithstanding parental direction and attempts to correct."

Moreover, the court also found the level of aggression Ed. and/or Ek. exhibited during visits exceeded the bounds of a typical sibling rivalry; and that reading Agency's reports of the in-person visits was "fatiguing," as they were "very intense." Ms. Carter added the visitation logs described some of these visits as "chaotic," and opined the two girls' dysregulated behavior resulted from trauma and attachment disorder that caused them to act out.

As summarized *ante*, during Father's in-person visits with Ed. and Ek. in March and April 2022, the girls hit each other and Father, including with their hands, toys, and other objects; bit and kicked him; slapped him in the face; stabbed him with a toy syringe and a pencil; and openly defied him, including by throwing food on the floor and cups full of liquid and other items

at him, running away and hiding from him, and refusing to follow his direction.

This evidence supports the juvenile court's finding there was an "unhealthy aspect" to the relationship between Father and Ed. and/or Ek. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 [the " ' "negative" effect of interaction between parent and child' " is one of many factors the juvenile court may consider in assessing whether the child would "benefit" from continuing the relationship].)

Third, the evidence of extreme dysregulation of Ed. and/or Ek. during visits with Father, when viewed in light of the experts' diagnoses that the girls suffered from attachment disorder and emotional trauma, also supports the finding the girls had "particular needs" that Father was unable to meet. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 [noting one of the factors a court may consider is whether a parent can meet a child's "particular needs"]; *Mary C.*, *supra*, 48 Cal.App.5th at p. 801 [consideration of the entire record is appropriate in determining whether or not the parental-benefit exception is supported by substantial evidence].)

As we have noted, Father never cared for Ek., and had only cared for Ed. for about four to six months in 2018, when she was a newborn and the family was living in Arizona. Furthermore, throughout dependency Father's visits with Ed. and Ek. remained supervised. And, while Father, in the weeks leading up to the section 366.26 hearing in April 2022, brought food and gifts for the girls and affectionately interacted with them during in-person visits, there is no evidence he helped or assisted the girls to meet their special needs, which arose as a result of their spending almost all of their young lives in foster care, in multiple placements, outside of his care. (See *Caden C.*, 11 Cal.5th at p. 632; see also *In re J.C.* (2014) 226 Cal.App.4th 503, 530 [a

38

parent may not " 'establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact' "]; *In re Jason J.* (2009) 175 Cal.App.4th 922, 937 [" 'A biological parent who has failed to reunify with an adoptable child may not derail adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent."]; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575 [noting "[i]nteraction between natural parent and child will always confer some incidental benefit to the child," and the "significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation" that "arises from day-to-day interaction, companionship and shared experiences"].)

Father, however, claims the juvenile court's finding on element two is flawed on both an evidentiary and legal basis. We disagree.

As to the former, Father claims the court based its no-benefit finding solely from his inability to correct what he claims were the two girls' "long-standing and pervasive behavioral issues during his weekly supervised visitation." As to the latter, Father claims the court improperly considered his caregiving ability and his adequacy as a parent, as opposed to focusing on the two girls and the "benefit" to them in continuing the relationship.

Initially, we reject Father's claim because his argument presupposes facts not supported by the record. Indeed, the record shows that Ed. and Ek. had flourished in the care of their former de facto parents between October 2019, when they were first placed in the home, and April 2021, when they were reunified with Mother for the trial visit; that just prior to being placed with Mother, the juvenile court refused to remove Ed. and Ek. from the de facto parents, after finding there was no protective issue; and that once the

39

girls were placed with paternal relatives in July 2021, they also flourished and were meeting all of their developmental milestones. While the evidence of in-person visits with Father (and Mother) in March/April 2022 shows Ed. and/or Ek. experienced emotional dysregulation, it does not support a finding that Ed. or Ek. had "long-standing," "pervasive" behavioral issues as Father posits. (See, e.g., *In re Salvador M.* (2005) 133 Cal.App.4th 1415, 1422 [arguments based on unsupported evidence does not rise to the level of substantial evidence].)

In any event, in determining whether substantial evidence supports the court's findings we review the entire record, consider the evidence in the light most favorable to the order, and resolve all conflicts in favor of the order. (See *M.G.*, *supra*, 80 Cal.App.5th at p. 848; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) From our discussion, it is evident there was substantially more evidence than merely the children's behavior during the handful of in-person visits with Father that supported the court's no-benefit finding, including their young ages; their lack of being in his care for most (i.e., Ed.), if not all (i.e., Ek.), of their lives; his inability to meet their "particular needs" (see *Caden C.*, *supra*, 11 Cal.5th at p. 632); and his own substantial life-issues that negatively impacted his relationship with them, including perhaps most notably, his lack of insight into the protective issue that brought them into dependency.

Indeed, as to this last factor, Father testified at the section 366.26 hearing that the "only two people" Ed. and/or Ek. "had in their life that ha[d] always been there one way or another has been [Father] and [Mother]." We conclude this testimony and the inferences to be drawn from it, when compared to the evidence in the record, actually *supports* the court's no-

40

benefit finding on element two. (See *Mary C.*, *supra*, 48 Cal.App.5th at p. 801.)

Because there is substantial evidence in the record to support the juvenile court's finding of a lack of "benefit" in continuing the relationship between Father and Ed. and/or Ek. (see *Caden C.*, *supra*, 11 Cal.5th at p. 632), we must affirm that finding even though evidence to the contrary also may also have existed (*id.* at p. 640; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576).

We also disagree with Father's claim the juvenile court committed legal error by considering his "caregiving abilities" in connection with element two. A fair reading of the record shows the court was considering the girls' dysregulated behavior during supervised visits not to show that Father was or was not an adequate parent, but rather to show there was a "very unhealthy aspect" in their relationship that outweighed some positive attributes. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632.)

## 2. Element Three

Under this element, Father was required to show by a preponderance of the evidence that terminating the (presumed) "substantial, positive, emotional attachment" of Ed. and/or Ek. to him "would be detrimental to the child[ren] even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id.* at p. 634.) Instead, it must weigh the benefits and disadvantages of the child's potential life in an adoptive placement against the benefits and disadvantages of continuing the parental bond in a less secure placement. (*Id.* at p. 633.) This evaluation necessarily involves a

"delicate balancing" in "assessing the likely course of a future situation that's inherently uncertain." (*Id.* at p. 640.)

Here, the juvenile court found the benefits of adoption by paternal relatives outweighed the detriment to Ed. and/or Ek. of terminating their relationship with Father. We conclude this determination was not arbitrary, capricious, or patently absurd. (See *Caden C.*, *supra*, 11 Cal.5th at p. 641; *M.G.*, *supra*, 80 Cal.App.5th at pp. 848-849.)

The record supports the court's finding that Ed. and Ek. were benefiting from the "positive nature" of their placement with paternal relatives; that the girls "desperate[ly] need[ed]" consistent caregivers to help them with their "attachment difficulties" and "emotional confusion" for which they were in therapy; that the girls had been in multiple placements throughout dependency and needed the "security" of knowing they were not going to another placement; and that adoption provided all of these and many other benefits for the girls, who were bonded to their caregivers and were thriving in the caregivers' home.

Conversely, the court found the two girls would not substantially benefit if their relationship with Father continued; that there was, on balance, a "very unhealthy aspect" of that relationship, as evidenced by his supervised visits that at times were "intense" and "chaotic"; that throughout the lengthy dependency, Father neither had unsupervised visits with the girls nor was he helpful in addressing their "particular needs"; and that during dependency and despite his testimony otherwise, he was absent for substantial periods of time from the girls' lives.

In sum, the juvenile court had been involved in this case since dependency began in August 2019 through termination of parental rights in April 2022. It was well informed of the relationship, or lack thereof, between

42

Father, Ed., and/or Ek. during the course of dependency such that it could engage in the "delicate balancing" it was required to undertake when terminating parental rights. (See *Caden C.*, *supra*, 11 Cal.5th at p. 640.) Its determination that the benefits of adoption outweighed the detriment to the children in terminating Father's parental rights was not arbitrary, capricious, or absurd. (See *id.* at p. 641.)

Father nonetheless claims that a legal guardianship could have been ordered for Ed. and/or Ek., which would have allowed the two girls to remain in a stable placement with paternal relatives while maintaining Father's parental rights. (See § 366.26, subd. (b)(1)-(7) [a court has three options for permanent placement of a dependent child in the following order of preference: adoption, guardianship, or long-term foster care].) In support, Father argues there was "no evidence in this record" that paternal relatives would not agree to a guardianship. We disagree with Father's recitation of the evidence.

Ms. Carter, responsible for Agency's permanency recommendations, stated in Agency's February 3, 2022 addendum that she had had "*several* conversations with the paternal relatives regarding the permanent plan of Legal Guardianship and Adoption" (italics added); and that paternal relatives "*carefully analyzed* the benefits of both options of permanency, and after considering what they believed was in Ed[.'s] and Ek[.]'s best interest, they agreed that adoption would be in the girl[s'] best interest." (Italics added.)

From the foregoing, we conclude there is substantial evidence in the record, including the inferences to be drawn from such evidence, to support the finding that paternal relatives thoughtfully considered a legal guardianship but ultimately decided against it in favor of adoption as the

best plan for Ed. and Ek. (See *M.G.*, *supra*, 80 Cal.App.5th at p. 848; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

In addition, we reject as speculative Father's argument that Agency's February 3 report merely provided the caregivers' "*preference* and not an unwavering *demand*" for a plan of adoption. (See *In re Ma.V.* (2021) 64 Cal.App.5th 11, 22 ["Substantial evidence . . . must be meaningful and significant and cannot be merely speculative."].) Father certainly could have pursued this argument at the section 366.26 hearing during his cross-examination of Ms. Carter, but chose not to do so. "While substantial evidence may consist of inferences, such inferences must rest on the evidence; inferences that are the result of speculation or conjecture cannot support a finding." (See *In re Precious D.* (2010) 189 Cal.App.4th 1251, 1259.)

## II.

## ICWA

Mother, joined by Father, claims the juvenile court and Agency failed to satisfy their respective obligations under ICWA and related California law by not inquiring with extended family members whether Er., Ed., and/or Ek. were of Native American ancestry. Although the record shows Mother, at the beginning of dependency, denied the children had such ancestry,[16] that changed on April 8, 2021, when, in connection with Agency's supplemental petition to remove Er. and Ez. a second time, Mother claimed a great-great

---

[16] In its July 24, 2019 dependency report, Agency noted Mother responded "No" to the following questions: "Has anyone in the family ever lived on a reservation?" "Has anyone in the family ever received any financial, medical, or educational assistance from a tribe?" "Does anyone in the family speak a Native American language?" "Is anyone active in tribal activities such as tribal council meetings, religious rituals, or pow-wows?" "Is any family member a member of a tribe or an enrolled member in a tribe?"

grandmother may have had Native American ancestry. Mother, however, could not identify the tribe.

Federal regulations implementing ICWA require that state courts, at the commencement of a juvenile dependency proceeding, "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." (25 C.F.R. § 23.107(a) (2022).)

Under California law, the juvenile court and county child welfare department also " 'have an affirmative and *continuing* duty to inquire whether a child,' who is the subject of a juvenile dependency petition, 'is or may be an Indian child.' [Citations.] The child welfare department's initial duty of inquiry includes 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' (§ 224.2, subd. (b).)" (*In re Austin J.* (2020) 47 Cal.App.5th 870, 883, italics added; see also § 224.1, subd. (c) ["extended family member" is defined in section 1903(2) of ICWA as a person who has reached the age of 18 and who is a dependent child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in law, niece or nephew, first or second cousin, or stepparent"].) State courts must also "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (25 C.F.R. § 23.107(a) (2022).)

Here, Agency concedes ICWA noncompliance, noting it had contact with several extended family members of Er., Ed., and/or Ek. in this case, as summarized *ante*, but did not make and/or document any ICWA inquiry with them. (See *In re H.V.* (2022) 75 Cal.App.5th 433, 438 [child welfare agency

45

prejudicially erred in inquiring only with the mother of a dependent child whether the child was of Native American ancestry because the agency's "first-step inquiry duty under ICWA and state law was broader, requiring it also to interview, among others, extended family members and others who had an interest in the child"].) We accept Agency's concession and conclude that, because of ICWA noncompliance for each child, a conditional reversal and limited remand are necessary.

## DISPOSITION

The juvenile court's April 19, 2022 order terminating parental rights (1) of Mother as to Er., Ed., and Ek. and (2) of Father as to Ed. and Ek. is conditionally reversed. The matter is remanded with directions for the court to vacate its finding that ICWA does not apply and to instruct Agency to complete its initial inquiry under ICWA and California law. If, after completing its inquiry, neither Agency nor the court has reason to believe or know that Er., Ed., and/or Ek. are of Native American ancestry, the April 19 order shall be reinstated. If Agency or the juvenile court has reason to believe that any of these children are of Native American ancestry, the court shall proceed accordingly under ICWA and California law.

In all other respects the April 19 order is affirmed.

IRION, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.

46